MGD

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Angel Goff, | No. CV 17-01623-PHX-JJT (DMF) |
| Plaintiff, | |
| v. | **ORDER** |
| State of Arizona, *et al.*, | |
| Defendants. | |

Plaintiff Angel Goff, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona state law. (Doc.129.) Pending before the Court are (1) Defendants Ryan, McWilliams, Moody (hereinafter, "Prison Official Defendants") and the State of Arizona's Motion for Summary Judgment (Doc. 141), which Plaintiff opposes (Doc. 152), and (2) Defendant Juan Ramirez's Motion for Partial Summary Judgment (Doc. 142), which Plaintiff opposes (Doc. 149).

The Court will grant the Prison Official Defendants and State of Arizona's Motion and will deny Defendant Ramirez's Partial Motion.

**I.    Background**

In her Third Amended Complaint, Plaintiff asserts that she is a transgender woman presently in the custody of the Arizona Department of Corrections (ADC). (Doc. 129 ¶¶ 1, 21.) Plaintiff alleges that from 2014 until 2016, Defendant Ramirez, a Corrections Officer, "molested, impermissibly touched, and sexually assaulted" her. (*Id*. ¶ 5.) Plaintiff alleges that as a result of Ramirez's abuse, she "has experienced debilitating anxiety, severe

1  depression, and suicidal ideations, in addition to post-traumatic stress symptomology." (*Id.*
2  ¶ 67.) Plaintiff also names as Defendants the State of Arizona; then-ADC Director Charles
3  Ryan; then-ADC Division Director of Offender Operations Carson McWilliams; and
4  ASPC-Lewis Warden Chris Moody. (*Id.* ¶¶ 12-14.) Plaintiff sues the Prison Official
5  Defendants in their official capacities for injunctive relief and in their individual capacities
6  for damages.[1] (*Id.*)

7       Count One asserts a claim of excessive force in violation of the Fourth and Eighth
8  Amendments against Defendant Ramirez; Count Two asserts a failure-to-protect claim
9  under the Eighth and Fourteenth Amendments against the Prison Official Defendants;
10  Count Three (assault and battery), Count Four (negligence), and Count Five (negligence
11  per se) are all asserted against Defendants Ramirez and the State of Arizona. (*Id.* ¶¶ 68-
12  127.) Plaintiff seeks damages, declaratory and injunctive relief, attorneys' fees, and costs.
13  (*Id.* at 22-23.)

14       The Prison Official Defendants and the State of Arizona move for summary
15  judgment on the basis of exhaustion, qualified immunity, and statutory immunity.
16  (Doc. 141.) Defendant Ramirez moves for partial summary judgment on the basis of
17  absolute immunity, qualified immunity, and statutes of limitations. (Doc. 142.)

18  **II.   Summary Judgment Standard**

19       A court must grant summary judgment "if the movant shows that there is no genuine
20  dispute as to any material fact and the movant is entitled to judgment as a matter of law."
21  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The
22  movant bears the initial responsibility of presenting the basis for its motion and identifying
23  those portions of the record, together with affidavits, if any, that it believes demonstrate
24  the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

25       If the movant fails to carry its initial burden of production, the nonmovant need not
26  produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099,

27  _____

28      [1] On January 28, 2020, the Court substituted current ADC Director David Shinn for Ryan in his official capacity. (Doc. 136.) Ryan remains a Defendant in his individual capacity.

1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III. Prison Official Defendants and Arizona's Motion for Summary Judgment

### A. Relevant Facts

#### 1. Facts Related to Plaintiff's Incarceration

Plaintiff is a male-to-female transgender woman and has been in ADC custody since 1996. (Doc. 153 (Pl.'s Statement of Facts) ¶ 1.) Plaintiff had plastic surgery to appear more feminine, underwent hormone therapy for 28 years, and is self-castrated. (*Id.* ¶ 3.) As of September 2019, Plaintiff is one of approximately 113 transgender prisoners in ADC custody, 19 of whom are at Arizona State Prison Complex (ASPC)-Lewis, a male prison facility in Buckeye, Arizona, which "leads the department in assaults." (*Id.* ¶¶ 4-5.) Plaintiff, "who in virtually all respects is a woman," has only been housed in male facilities since her incarceration began, including in dormitory housing with up to 30 male prisoners. (*Id.* ¶ 9.) ADC policy requires that transgender prisoners be housed and searched based on

their biological sex at birth. (*Id.* ¶ 8.) The threat of violence and sexual violence to transgender prisoners "is an everyday occurrence" and, since 1996, Plaintiff has been harassed and abused by at least 3 prison guards, including Ramirez, and 15 prisoners; the harassment and abuse included unwanted advances, non-consensual touching, forced oral sex, beatings, and rape. (*Id.* ¶¶ 6, 7, 11.)

Around November 2015, ADC developed Department Order (DO) 810, which governs the management of lesbian, gay, bisexual, transgender, and intersex prisoners. (*Id.* ¶ 13.) ADC formed a Transgender Committee whose objective is to ensure that transgender prisoners are housed safely and without being assaulted. (*Id.* ¶ 14.) The Transgender Committee is required to assess transgender prisoners within 7 days of intake and to reevaluate their housing every 180 days, taking into account the prisoners' own views of their safety, but the Transgender Committee regularly failed to do either. (*Id.* ¶ 15.) Defendant McWilliams was on the Transgender/Intersex Committee while he was Division Director of Operations for ADC. (Doc. 139 (Defs.' Statement of Facts) ¶ 32.) Between 2013 and 2015, McWilliams "was personally aware of 15-20 sexual assault complaints made by Plaintiff" but took no specific action to address them and the Transgender Committee did not address any of these complaints. (Doc. 153 ¶¶ 23-24.)

Defendant Ramirez began working as a correctional officer (CO) for ADC on July 30, 2012 and worked at the ASPC-Lewis, Buckley Unit, until he resigned on June 28, 2016. (Doc. 153 ¶¶ 33, 35; Doc. 139 ¶¶ 61-62.) Ramirez later admitted to an ADC investigator that he had "excessive sexual cravings," but nothing in ADC's hiring process was designed to uncover this. (Doc. 153 ¶¶ 33, 34.) On August 25, 2013, Ramirez's performance review stated that he "maintains a professional demeanor and demonstrates expertise in all he does" and an August 31, 2013 comment recommended that Ramirez receive permanent status. (Doc. 139 ¶¶ 68-69.)

On September 18, 2013, Ramirez was arrested and cited by the Phoenix Police Department for soliciting an undercover police officer posing as a prostitute. (Doc. 153 ¶ 36; Doc. 139 ¶ 72.) ADC conducted an Administrative Investigation into Ramirez's

arrest, and Ramirez initially denied his involvement, but later reversed course and confessed. (Doc. 153 ¶¶ 37, 38.)

Deputy Warden Dorsey noted that Ramirez's actions constituted a Class 7 violation for "intentional untruthfulness" during the investigation, a Class 6 violation for violating the standards of conduct for State employees, and a Class 5 violation for committing "a less serious misdemeanor[.]" (Doc. 139 ¶ 80; Doc. 139-2 at 220.) On November 22, 2013, Ramirez was suspended for 80 hours without pay by Deputy Warden Dorsey as a result of his arrest. (Doc. 139 ¶¶ 78-79; Doc. 139-3 at 34.) "The Prison Officials never considered firing Ramirez" and did not supervise Ramirez more closely after his arrest or assess whether he might pose a risk to prisoners. (Doc. 153 ¶¶ 41, 42.) Ramirez testified that he did not have to register as a sex offender as a result of this incident. (Doc. 139 ¶ 86.) On January 31, 2014, Ramirez's performance review said, "End of the year close out meeting expectations."[2] (*Id.* ¶ 70.) Ramirez complied with his annual training requirements from 2012 through June 2015, and he was rated as meeting all expectations for the July 2014 through 2015 rating period. (*Id.*)

In early 2015, Ramirez began harassing Plaintiff, first by flirting with her and by walking by her cell and indicating that he wanted to see her breasts and other body parts. (Doc. 153 ¶¶ 43-45.) Ramirez masturbated in front of Plaintiff and touched and pulled his genitals when she walked by him. (*Id.* ¶ 46.) Ramirez escalated his conduct "to assaultive and sham" pat-down searches of Plaintiff during which he would grope Plaintiff's body and press his genitals against her. (*Id.* ¶ 47.) In early 2015, Ramirez forced Plaintiff to perform oral sex on him in the staff restroom. (*Id.* ¶¶ 48, 49.) Plaintiff did not feel she could

---

[2] Defendants' paragraphs 70 and 71 are based on documents in their Exhibit 12, which appear to be personnel records, including performance review documents. (*See* Doc. 139-2 at 192-195, 199, 207 and 213.) Plaintiff asserts that Exhibit 12 is inadmissible because Defendants have failed to authenticate it. (Doc. 154 ¶72, citing Fed. R. Evid. 901(a).) Because the distinctive appearance, contents, and substance of the documents in Exhibit 12 demonstrate that they are what Defendants purport them to be, i.e., personnel records, and Plaintiff has not claimed otherwise, these documents satisfy Federal Rule of Evidence 901(a)(4), which provides that an item may be authenticated based on "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Civ. P. 901(a)(4). __

say no because Ramirez had the power to punish her if she did not do as he demanded. (*Id.* ¶ 50.) Between early 2015 and September 2015, Ramirez forced Plaintiff to perform oral sex on him 4-6 times. (*Id.* ¶ 51.)

Around September 2015, Plaintiff was transferred from the Buckley Unit to the Bachman Unit, to a dormitory style setting, where other prisoners harassed and abused her. (*Id.* ¶¶ 52, 53.) Plaintiff made at least 4 complaints to ADC officials, including a "Significant Incident Report." (*Id.* ¶¶ 55-56.) On February 24, 2016, Plaintiff filed a PREA complaint about other prisoners at the Bachman Unit harassing her. (Doc. 139 ¶ 100.) On February 26, 2016, Plaintiff was transferred back to the Buckley Unit, where Ramirez was still working. (*Id.* ¶ 101; Doc. 153 ¶ 59.) On March 10, 2016, Criminal Investigation Unit (CIU) Investigator Phillip Moreno interviewed Plaintiff about her February 2016 PREA complaint, and Plaintiff informed Moreno "that she felt safe housing where she was currently located, the Buckley Unit," and Plaintiff did not mention Ramirez or sexual contact with any ADC employee. (Doc. 139 ¶¶ 102-104.) Plaintiff does not dispute that she told Moreno she felt safe where she was currently housed but adds that she also told Moreno that she "does not wish to house in a dormitory-style setting."[3] (Doc. 154 ¶ 103.)

Ramirez continued his abuse of Plaintiff when she returned to the Buckley Unit, conducting more than 15 assaultive pat-down searches of Plaintiff, groping her body and moaning and grunting in a sexual manner. (Doc. 153 ¶ 60.) These searches happened in view of other guards who joked about how much Ramirez "liked" Plaintiff. (*Id.* ¶ 61.) Between April and May 2016, Ramirez forced Plaintiff to perform oral sex on him approximately 3-5 times more, and 8-12 times in all, and Plaintiff states "there was nothing mutual about it." (*Id.* ¶¶ 62-64.) Each time, Ramirez took Plaintiff to the staff restroom, which required passing through at least 4 sets of doors that had to be opened by other guards in the control room and there were cameras in the hallway leading to the staff

---

[3] Plaintiff does not say whether she was in a dormitory-style setting in the Buckley Unit.

restroom that at least 4 staff members could view. (*Id.* ¶¶ 62-66.) No guard ever tried to stop Ramirez. (*Id.* ¶ 67.)

Plaintiff "repeatedly" told ADC staff members about Ramirez's abuse, but they ignored her. (Doc. 153 ¶ 68, citing Ex. 1 (Pl. Dep.) at 64:14-65:2.) In the cited portion of her deposition, Plaintiff testified:

> Q:      Okay. Did you tell any other inmates that Officer Ramirez had, in your words, raped you?
>
> A.      No.
>
> Q.      Did you tell any agency staff members?
>
> A.      I tried.
>
> Q.      What do you mean by you tried?
>
> A.      I tried to get help, and I was ignored.
>
> Q.      So you told an ADC staff member that another correctional officer had raped you and nobody did anything?
>
> A.      No.
>
> Q.      What did you tell an ADC staff member?
>
> A.      That I needed help, and that I really needed to talk to them.
>
> Q.      Did you explain the nature of the help you needed?
>
> A.      No, I wasn't in a position to.
>
> Q       When you say that you weren't in a position to . . . what do you mean?
>
> A.      There were other officers around, Ramirez was around, other inmates were around.

(Doc. 153-1 at 29-30 (Pl. Dep. at 64:14-65:13.))

In June 2016, Plaintiff called the PREA Hotline to report Ramirez's abuse. (Doc. 153 ¶ 69.) ADC's Criminal Investigative Report states that on June 23, 2016, CIU received notification of a recorded message left on the PREA Hotline in which a prisoner "stated [s]he has been in a sexual relationship with an officer for over a year and does not feel [s]he

can say no, requesting assistance." (Doc. 139 ¶ 88; Doc. 139-4 at 3.) Plaintiff denies that "she was in a 'relationship' with Ramirez or that their sexual contact was in any way consensual." (Doc. 154 ¶ 88.)

CIU Investigator James Currier interviewed Plaintiff on June 23, 2016 regarding her PREA complaint, and Plaintiff told Currier "it had started over a year ago." (Doc. 153 ¶ 73; Doc. 139 ¶¶ 90-91.) When asked to clarify, Plaintiff said that around January 2015 "flirtation began getting 'really heavy'" and that as time went on it "got a little more serious." (Doc. 139 ¶¶ 92-93.) Plaintiff told Currier that it escalated to "Plaintiff exposing her breasts to Ramirez" who would masturbate in front of Plaintiff. (*Id.* ¶ 94.) Plaintiff states that Ramirez demanded she expose her breasts to him. (Doc. 154 ¶ 94.) Plaintiff indicated to Currier that once she was back at the Buckley Unit, the sexual contact with Ramirez started again and that the last incident took place on May 31, 2016 and that she felt she could no longer say no to Ramirez. (Doc. 139 ¶¶ 104-06.) When asked if Ramirez ever offered or promised her anything in exchange for sex, Plaintiff said "No, it was never like that." (*Id.* ¶ 107.)

Currier alerted Defendants Ryan, McWilliams, and Moody about Plaintiff's PREA complaint. (Doc. 153 ¶ 74.) Currier interviewed Ramirez 3 times during the investigation. (*Id.* ¶ 75.) Ramirez denied Plaintiff's allegations during the first two interviews. (Doc. 139 ¶¶ 109-111.) Ramirez was interviewed a third time on June 28, 2016, and this time he admitted to some of Plaintiff's allegations, specifically that he engaged in oral sex with Plaintiff on two occasions. (*Id.* ¶ 113.) CIU arrested Ramirez after that interview and Ramirez resigned from ADC that same day. (*Id.* ¶¶ 114-115.) Ramirez was charged and pleaded guilty to two counts of attempted unlawful sexual conduct with an inmate. (Doc. 153 ¶ 78.) The parties dispute whether Plaintiff told any ADC staff members about her sexual contact with Ramirez prior to her call to the PREA hotline on June 23, 2016. Defendants contend Plaintiff did not tell any ADC staff members prior to June 23, 2016, and Plaintiff contends that she did. (Doc. 139 ¶ 117; Doc. 154 ¶ 117.) Plaintiff bases her

position on the testimony cited above. (Doc. 154 ¶ 117, citing PSOF ¶ 68, which cites Pl. Dep. at 65:14-65:2.)

After Ramirez resigned, "the Prison Officials didn't change a whole lot to ensure [Plaintiff] would be protected" and conducted no further assessment of her safety. (Doc. 153 ¶¶ 80-81.) Since 2016, Plaintiff has made at least 7 additional complaints to ADC staff about mistreatment, including by guards, and 7 of those complaints were formal PREA complaints. (*Id.* ¶ 82.) McWilliams learned of a number of additional complaints by transgender prisoners about harassment and sexual abuse between October 2017 and June 2019. (*Id.* ¶ 83.) Plaintiff is still housed in a male facility, is still subject to searches by male guards, and there are still no cameras in the staff restroom. (*Id.* ¶¶ 84-86.)

DO 125.01 § 1.1 prohibits sexual harassment and any sexual contact between staff and prisoners and states that "[t]here is no consensual sexual contact between staff and inmates or offenders" and that those who engage in unlawful sexual conduct are subject to state and/or federal criminal prosecution. (Doc. 139-1 at 28.) The policy requires that the Division Director for Offender Operations ensure that every prison provides prisoners, during orientation, with information on preventing sexual assault, treatment and counseling for victims of sexual abuse, and a simplified and expedient process for prisoners to report sexual assaults. (Doc. 139 ¶ 5.) Wardens must also post such information on prisoner bulletin boards and it is available to all prisoners regardless of their custody level or location. (*Id.* ¶ 7.) Defendant Moody was Warden at ASPC-Lewis from 2014 to 2017 and affirmed that he complied with DO 125's requirements on posting information about preventing sexual assaults. (*Id.* ¶ 8.)

Wardens must also ensure that all employees and non-ADC personnel under their authority meet or exceed DO 590's employee training and education requirements. (*Id.* ¶ 9.) "Correctional Series" employees must complete a minimum of 280 hours of pre-service training, which includes PREA compliance and professionalism/ethical behavior. (*Id.* ¶ 10.) ADC's PREA compliance training in 2015 provided COs with information on preventive measures to support ADC's goal of zero tolerance of sexual contact, abuse, or

harassment of prisoners. (*Id.* ¶ 11.) Plaintiff asserts that the training is not specific to transgender prisoners and that Defendant Ramirez "swears the AD[]C never trained him on how to interact with transgender inmates." (Doc. 154 ¶ 11; Doc. 153 ¶ 12.) ADC's PREA policies, which are included in ADC's Annual In-Service Training Plan, covers LGBTI issues. (Doc. 139 ¶ 13.) Plaintiff denies this fact based on Ramirez's response to an interrogatory in which he stated that he "received all initial and required refresher trainings for a corrections officer, but he "does not recall receiving any training specific to transgender inmates" and his affirmative response to a Request for Admission that ADC "did not train YOU on how to interact with transgender inmates." (Doc. 154 ¶ 13; Doc. 153-1 at 258, 265 (capitalization in original).)

ADC's hiring process includes background investigations and applicants will fail the background check if they have been convicted of a felony and possibly if they have a recent misdemeanor conviction. (Doc. 139 ¶¶ 14-15.) A misdemeanor conviction does not preclude hiring nor is it grounds for automatic termination. (*Id.* ¶ 16.) A violation of the Standards of Conduct for State employees is a Class 6 offense, which results in a minimum of a 40-hour suspension without pay; intentional untruthfulness is a Class 7 offense, and results in a minimum of an 80-hour suspension without pay, and a second Class 7 offense can result in dismissal. (*Id.* ¶¶ 18-19.) Conviction of a misdemeanor is a Class 7 offense and conviction of a felony will result in dismissal. (*Id.* ¶ 20.)

Defendant Moody testified that he did not recall seeing the letter that Deputy Warden Dorsey wrote about Ramirez's 2013 arrest for soliciting a prostitute before this lawsuit was filed, he does not recall speaking with Dorsey about this incident, and since he was not the Warden of ASPC-Lewis in 2013, he would not have received Dorsey's letter as part of his professional responsibilities. (Doc. 139 ¶¶ 82-84.) Defendant McWilliams, who was Division Director of Operations from February 2014 until June 2019, testified that he was aware that Ramirez was disciplined in connection with the arrest for soliciting a prostitute but that he was not familiar with Ramirez's performance as a CO. (*Id.* ¶¶ 85-86.)

**2.      Facts Related to Exhaustion of Administrative Remedies**

Department Order (DO) 802, *Inmate Grievance Procedure*, sets forth the process that prisoners must follow to complete ADC's administrative grievance process regarding any issues related to institutional life or conditions of confinement (hereinafter the "Grievance Procedure").[4] (Doc. 139 ¶ 34.) A written copy of the Grievance Procedure is available to prisoners in each unit library and prisoners also receive a written and oral explanation of the Grievance Procedure during and as part of the orientation process when they arrive at a new facility.[5] (*Id.* ¶ 35.)

Defendants set forth the steps for the standard, non-medical Grievance Procedure, which includes the following: (1) the prisoner first attempt to resolve their complaint through informal means either verbally or by submitting an Informal Complaint Resolution form; (2) if the issue is not resolved, the prisoner must file an Inmate Complaint Resolution form to the unit CO III; (3) if the issue is not resolved, the prisoner must file a Formal Grievance to the unit CO IV Grievance Coordinator; (4) if still unresolved, the prisoner must file an appeal to the ADC Director. (*Id.* ¶¶ 38-50; Doc. 153-1 at 466-468 (DO 802 §§ 2.0–4.0.) The Director's decision is the final step, and ADC considers this decision to constitute exhaustion of administrative remedies. (Doc. 139 ¶ 50.) The Grievance Procedure does not serve as a duplicate appeal process or substitute appeal process for those areas that have their own independent appeal processes, including disciplinary hearings, publications reviews, protective custody determinations, security threat group validations, and inmate classifications. (Doc. 153-1 at 465 (DO 802 § 1.3).)

---

[4] Plaintiff does not dispute Defendants' facts about the Grievance Procedure for standard, non-medical grievances, but denies that the non-medical Grievance Procedure that Defendants outline has any bearing on sexual offense grievances like Plaintiff's, which are addressed separately in DO 802, Section 8.

[5] Defendants assert that the relevant Grievance Procedure had an effective date of December 12, 2013 and was in effect through October 16, 2016. (Doc. 139 ¶ 33.) However, Defendants did not submit a copy of DO 802. Plaintiff did submit a version of DO 802 that became effective October 16, 2016. (See Doc. 153-1 at 463-476.) Because Defendants did not submit to the Court a copy of what they say is the relevant version of DO 802, the Court will refer to the version submitted by Plaintiff, which does not differ materially from the facts set forth by the State Defendants.

If a prisoner has filed a grievance appeal with the Director, there will be a record of it in the Grievance Appeal Log and the Grievance Appeal File at ADC's Central Office. (Doc. 139 ¶ 57.) Rodreco Kepney, ADC's Grievance Appeals Officer, reviewed the ADC Central Office Grievance Appeal Log and Grievance Appeal File for all grievance appeals submitted by Plaintiff between January 1, 2015 and June 1, 2017 regarding her Eighth Amendment deliberate indifference or conditions of confinement claim. (*Id.* ¶ 58.) Kepney found no record or evidence that either the Appeals Unit staff or the ADC Director ever received a grievance appeal from Plaintiff regarding her Eighth Amendment deliberate indifference or conditions of confinement claim. (*Id.* ¶ 59.)

A separate section of the DO 802 policy—section 8.0—specifically addresses sexual offense grievances. (Doc. 153-1 at 470-472.) This section provides that if a staff member receives an Informal Complaint or Formal Grievance at any level that alleges a possible PREA violation, the staff member must immediately initiate DO 125, *Sexual Offense Reporting*. (*Id.*) Section 8.0 further provides that there is no time limit in which a prisoner must submit a grievance regarding an allegation of sexual abuse. (*Id.* at 471 (DO 802 § 8.1.1).) Nor is the prisoner required "to use any informal grievance process or to otherwise attempt to resolve with staff an alleged incident of sexual abuse." (*Id.* (DO 802 § 8.1.3).) The Warden or the Warden's designee must issue a final decision on a grievance alleging sexual abuse within 90 workdays of the initial filing of the grievance. (*Id.* (DO 802 § 8.2.1).)

## B. Discussion

### 1. Exhaustion of Official-Capacity Claim in Count Two

Plaintiff styles her claim in Count Two against the Prison Official Defendants as a "Failure to Protect Against Foreseeable Sexual Assault in violation of the Eighth and Fourteenth Amendments to the Constitution." (Doc. 129 at 16.) As noted, Plaintiff is suing these Defendants in their official and individual capacities and she seeks a permanent injunction against the Prison Official Defendants "from subjecting Plaintiff to the unconstitutional and illegal policies, acts, practices, and omissions described in this

Complaint" and an order "against the Prison Official Defendants to take all other actions necessary to provide appropriate treatment and protection for transgender inmates and for the court to retain jurisdiction of this case until the Prison Official Defendants have fully complied with the orders of this Court and there is reasonable assurance that the Prison Official Defendants will continue to comply in the future absent continuing jurisdiction." (*Id.* at 22-23.)

Defendants argue that Plaintiff's official capacity claim and request for injunctive relief fail because she did not exhaust her administrative remedies. (Doc. 141 at 12.)

### a)   Legal Standard

Under the Prison Litigation Reform Act, a prisoner must exhaust "available" administrative remedies before filing an action in federal court. *See* 42 U.S.C. § 1997e(a); *Vaden v. Summerhill*, 449 F.3d 1047, 1050 (9th Cir. 2006); *Brown v. Valoff*, 422 F.3d 926, 934-35 (9th Cir. 2005). The prisoner must complete the administrative review process in accordance with the applicable rules. *See Woodford v. Ngo*, 548 U.S. 81, 92 (2006). Exhaustion is required for all suits about prison life, *Porter v. Nussle*, 534 U.S. 516, 523 (2002), regardless of the type of relief offered through the administrative process, *Booth v. Churner*, 532 U.S. 731, 741 (2001).

The defendant bears the initial burden to show that there was an available administrative remedy and that the prisoner did not exhaust it. *Albino v. Baca*, 747 F.3d 1162, 1169, 1172 (9th Cir. 2014); *see Brown*, 422 F.3d at 936-37 (a defendant must demonstrate that applicable relief remained available in the grievance process). Once that showing is made, the burden shifts to the prisoner, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. The ultimate burden, however, rests with the defendant. *Id.* Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to the prisoner, shows a failure to exhaust. *Id.* at 1166, 1168; *see* Fed. R. Civ. P. 56(a).

1    If summary judgment is denied, disputed factual questions relevant to exhaustion

2    should be decided by the judge; a plaintiff is not entitled to a jury trial on the issue of

3    exhaustion. *Albino*, 747 F.3d at 1170-71. But if a court finds that the prisoner exhausted

4    administrative remedies, that administrative remedies were not available, or that the failure

5    to exhaust administrative remedies should be excused, the case proceeds to the merits. *Id.*

6    at 1171.

7                    **b)      Analysis**

8    Defendants argue that although administrative remedies were available to her,

9    Plaintiff failed to exhaust those available administrative remedies in connection with her

10   official-capacity claims against the Prison Official Defendants. (Doc. 141 at 13-14.)

11   Defendants assert that they are not arguing that Plaintiff was required to formally grieve

12   the sexual contact with Ramirez, but that she is making claims about her conditions of

13   confinement and seeking injunctive relief, for which she was required to exhaust her

14   administrative remedies under the PLRA. (*Id*. at 15.)

15   Plaintiff responds that her issue is not subject to filing a non-medical grievance, but

16   is instead a "sexual offense" grievance, which follows an entirely separate protocol under

17   DO 802, Section 8, and has no time limit within which a prisoner must bring a sexual

18   offense grievance. (Doc. 152 at 18.) Plaintiff further argues that under Section 8, a prisoner

19   is not required to attempt informal resolution, there is no appeals process, and she was not

20   required to do anything after submitting her PREA reports, and so she properly exhausted

21   her administrative remedies. (*Id*.)

22   Defendants reply that Plaintiff's PREA complaint did not put them on notice that

23   Plaintiff "would be seeking relief for anything other than the sexual contact between herself

24   and Ramirez." (Doc. 161 at 12.) Defendants cite to a footnote in Plaintiff's Response in

25   which Plaintiff argues that Defendants "minimize the scope of [her] harm, which goes far

26   beyond Ramirez to encompass a near-daily risk of physical abuse by corrections officers

27   and other inmates" and that she is "entitled to injunctive relief to stop this continuing threat

28   of abuse." (*Id*.; Doc. 152 at 17 n.1.) Defendants argue that "[e]ither the harm alleged goes

1    far beyond Ramirez and should have been properly grieved, but was not, or the harm is
2    limited to Ramirez and therefore [Plaintiff's] claims for injunctive relief fail," but that
3    either way, Plaintiff "has not exhausted her administrative remedies for any claim except
4    arguably Ramirez's sexual assault." (Doc. 161 at 12.)

5          Plaintiff alleges in her Third Amended Complaint that the Prison Official
6    Defendants knew that as a transgender woman Plaintiff "faced an extreme and substantial
7    vulnerability to sexual assault and harm," that they knew or should have known "that she
8    filed a number of complaints documenting her susceptibility to sexual assault, harassment,
9    and abuse," and knew that Ramirez "had a history of illicit sexual deviancy, which exposed
10   [Plaintiff] to risks of great harm." (Doc. 129 ¶¶ 86-89.) Plaintiff further alleges the Prison
11   Official Defendants "have created and tolerated an atmosphere of lawlessness, having
12   developed and maintained long-standing, department-wide customs, law enforcement-
13   related policies, procedures, customs, practices, and/or failed to properly train and/or
14   supervise its officers in a manner amounting to deliberate indifference to the constitutional
15   rights of Plaintiff and of other inmates." (*Id.* ¶ 99.) And she alleges that due to the actions
16   of the Prison Official Defendants, her "extreme vulnerability to sexual assault will continue
17   indefinitely, absent relief." (*Id.* ¶ 105.)

18         The record shows that Plaintiff called the PREA hotline on June 23, 2016 about
19   Ramirez's abuse and CIU initiated an investigation that day. (Doc. 139 ¶¶ 88-89;
20   Doc. 139-4 at 3.) Plaintiff does not claim that she filed any informal or formal grievances
21   alerting prison officials of the risk of harm from other staff or prisoners either before or
22   after she called the PREA hotline. Plaintiff does assert that McWilliams was aware that she
23   had made 15-20 sexual assault complaints between 2013 and 2015, but Plaintiff does not
24   claim that she filed any informal or formal grievances related to those complaints.

25         Plaintiff's call to the PREA hotline on June 23, 2016 about Ramirez and the
26   subsequent CIU investigation were not an alternative grievance procedure and did not serve
27   to exhaust remedies for Plaintiff's official-capacity claim against the Prison Official
28   Defendants or her request for injunctive relief. *See Hunter v. Thompson*, 631 F. App'x 488

488-89 (9th Cir. 2016) (prisoner failed to exhaust remedies when he submitted his complaint of harassment through the PREA procedures instead of through the prison's offender grievance program); *see also Woodford v. Ngo*, 548 U.S. 81, 118 (Stevens, J., dissenting) (implying that the PREA does not supersede state administrative remedies). A CIU or PREA investigation is not listed in the DO 802 policy as a duplicate or substitute appeal process. (*See* DO 802 § 1.3 (Doc. 153-1 at 465).) Nor did Plaintiff's PREA complaint serve to alert prison officials to the nature of the wrong for which she seeks redress—other than the harassment and assault by Ramirez—that is, the "extreme vulnerability to sexual assault" that she suffered in the past and continues to face while housed in male prisons. *See Morton v. Hall*, 599 F.3d 942, 946 (9th Cir.2010) ("[A] grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.") (citation and internal quotation marks omitted). Finally, Plaintiff does not claim that there was anything that made the existing and generally available administrative remedies effectively unavailable to her with respect to her claims regarding her conditions of confinement and the alleged ongoing harassment and abuse from other prisoners and staff and being housed in a male prison. *Albino*, 747 F.3d at 1172.

Based on this record, Defendants have met their initial burden of showing that there was an available administrative remedy and that Plaintiff did not exhaust it with respect to her official-capacity claim in Count Two against the Prison Official Defendants. Because Plaintiff has failed to rebut this evidence by showing that she either exhausted this claim or that the existing and generally available administrative remedies were effectively unavailable to her, the Court will grant summary judgment to Defendants Ryan, McWilliams and Moody as to official-capacity claim and request for injunctive relief claim against them in Count Two.[6]

---

[6] The Court notes that Plaintiff appears to be alleging an ongoing Eighth Amendment violation and, as such, she is not precluded from grieving this claim for ongoing harm. However, given the age of this case, the Court is not inclined to stay this proceeding while Plaintiff exhausts her administrative remedies and Plaintiff would have to bring any properly exhausted claims in a new action. Moreover, to the extent Plaintiff seeks to grieve past sexual assaults, the Court notes that DO 802 § 8.1.1 does not set any time limit for a prisoner to "submit a grievance regarding an allegation of sexual abuse." (Doc. 153-1 at 471.)

### 2.   Qualified Immunity

Defendants argue that should a constitutional violation be found the Prison Official Defendants are entitled to qualified immunity from any damages claim. (Doc. 141 at 16.)

#### a)   Legal Standard

Government officials are entitled to qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Officials are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards,* 566 U.S. 658, 664, (2012)). Courts may address either prong first, depending on the circumstances in the particular case. *Pearson v. Callahan*, 555 U.S. 223, 230–32, 235-36 (2009).

For a right to be clearly established there does not have to be a case directly on point; however, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *White v. Pauly*, __ U.S. __, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna,* __ U.S. __, 136 S. Ct. 305, 308 (2017)). Accordingly, a right is clearly established when case law has been "earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017) (citing *White*, 137 S. Ct. at 551). To determine whether qualified immunity applies, the court must first identify the federal or constitutional right at issue; then it must attempt to "identify a case where an officer acting under similar circumstances as [the defendant] was held to have violated" that right. *Id*. If there is no such case, then the right was not clearly established, and the officer is protected from suit. *See id.* at 1117-18. The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation under the second prong of the analysis. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002).

### b)      Analysis

The Eighth Amendment requires prison officials to protect prisoners from violence because "being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 833–34 (1994); *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009). To prevail on a failure-to-protect claim, a plaintiff must present facts that satisfy a two-part test: (1) that the alleged deprivation was, objectively, sufficiently serious, and (2) that the official was, subjectively, deliberately indifferent to the prisoner's safety or acted with "a sufficiently culpable state of mind." *Id.* at 834; *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) (internal citation omitted).

Under the objective prong, "[w]hat is necessary to show sufficient harm for the purposes of the Cruel and Unusual Punishment Clause depends on the claim at issue." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). For a failure-to-protect claim, the prisoner must show that he was placed in conditions that posed a substantial risk of serious harm. *Farmer*, 511 U.S. at 834, quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).

Defendants make no argument regarding whether Plaintiff was subjected to conditions that posed a substantial risk of serious harm. Plaintiff has presented evidence that as a female transgender prisoner housed in male prisons she has been, since her incarceration began in 1996, subjected to harassment and abuse by at least 3 prison guards, including Ramirez, and 15 prisoners, and that this abuse included unwanted advances, non-consensual touching, forced oral sex, beatings, and rape. (Doc. 153 ¶¶ 1, 8, 9, 6, 7, 11.) While the only specific evidence Plaintiff provides relates to what happened with Ramirez, the evidence regarding Ramirez satisfies the objective prong of the deliberate indifference analysis.

The subjective prong requires "more than ordinary lack of due care for the prisoner's interest or safety." *Farmer*, 511 U.S. at 835 (quotation omitted). To prove deliberate indifference, a plaintiff must show that the official knew of and disregarded an excessive risk to inmate safety. *Id.* at 837. This standard "does not require that the . . . official believe

1   to a moral certainty that one inmate intends to attack another at a given place at a time

2   certain before that officer is obligated to take steps to prevent such an assault," but it does

3   require that the official "have more than a mere suspicion that the attack will occur." *Berg*

4   *v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (citation omitted). Also, "prison officials

5   who actually knew of a substantial risk to inmate health or safety may be found free from

6   liability if they responded reasonably to the risk, even if the harm ultimately was not

7   averted." *Farmer*, 511 U.S. at 844.

8        Defendants contend that Ramirez's misdemeanor 2013 arrest for solicitation, for

9   which he was not charged or convicted of any crime, did not put them on notice that

10   Ramirez had a propensity to have sexual contact with prisoners. (Doc. 141 at 7.)

11   Defendants assert that solicitation to commit an offense "is a class 3 misdemeanor if the

12   offense solicited is a misdemeanor" and that prostitution is a class 1 misdemeanor unless

13   an individual has 4 or more prior prostitution convictions, which Ramirez did not. (*Id.*,

14   citing Ariz. Rev. Stat. §§ 13-1002(b)(7) and 13-3214(E).)

15        Plaintiff argues more broadly that the Prison Official Defendants violated her Eighth

16   Amendment rights because she was assaulted by COs and prisoners in ADC's male prison

17   facilities and because the Prison Official Defendants knew that ASPC-Lewis was a violent

18   environment that "led the department in assaults" and knew that transgender prisoners are

19   part of an "identifiable group of prisoners who are frequently singled out for violent attack

20   by other inmates." (Doc. 152 at 14, quoting *Farmer*, 511 U.S. at 842.) Plaintiff contends

21   that the Prison Official Defendants knew she was at risk even before Ramirez's attacks

22   because they had access to "years-worth of information about [Plaintiff's] complaints about

23   her housing and the abuse she suffered at the hands of her fellow inmates." (*Id.*)

24        Plaintiff does not cite the evidence that supports her arguments, but she is

25   presumably referring to her facts stating that between 2013 and 2015, McWilliams "was

26   personally aware of 15-20 sexual assault complaints made by Plaintiff" but took no specific

27   action to address them, and that the Transgender Committee, on which McWilliams sat,

28   did not address any of these complaints. (Doc. 153 ¶¶ 18, 22-24.) However, Plaintiff

presents no specific information about those complaints such that the Court could find that McWilliams had a "sufficiently culpable state of mind" and was therefore deliberately indifferent to Plaintiff's health or safety. *See Farmer*, 511 U.S. at 834.

If Plaintiff's complaints were similar to the testimony Plaintiff gave about when she tried to tell a prison official about Ramirez before she called the PREA hotline, then no reasonable prison official would have been on notice that Plaintiff was in danger. Because Plaintiff provides no details about what information McWilliams received regarding prior sexual assaults, Plaintiff's evidence against McWilliams is too vague and conclusory to support her Eighth Amendment individual-capacity claim against McWilliams. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *Soremekun v. Thrifty Payless, Inc*., 509 F.3d 978, 984 (9th Cir. 2007) (" [c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment"). Accordingly, the Court will grant summary judgment to McWilliams on Plaintiff's individual-capacity claim in Count Two.

As to Defendant Warden Moody, Plaintiff asserts that Moody was regularly apprised of prisoners who were at a "substantial risk of imminent sexual abuse" and she asserts that Moody had access to ADC's Adult Inmate Management System (AIMS), which contained information "about Plaintiff's transgender status, previous sexual victimization, and her own perception of being vulnerable." (Doc. 153 ¶¶ 28-29.) Plaintiff's evidence, though, relies on Moody's deposition testimony, and the cited testimony is merely a general discussion about the duties of the Warden and does not address what Moody knew about Plaintiff or any of the information in her AIMS report. (*See* Doc. 153-1 at 325-327 (Pl. Dep. at 21:17-23:8).) Based on this record, no reasonable jury would conclude that Moody was subjectively aware of a serious risk of harm to Plaintiff and the Court will grant summary judgment to Moody on Plaintiff's individual-capacity claim in Count Two.

As to Defendant Ryan, Plaintiff asserts that under Ryan's supervision, ADC issued DO 810 on LGBTI prisoners, "over which Ryan had final review and approval," and that Ryan "regularly reviewed investigations involving staff arrests." (Doc. 153 ¶¶ 30-32.)

Plaintiff's evidence in support of these facts is McWilliams' deposition testimony in which he said Ryan reviewed and approved the transgender policy, Ryan's interrogatory response describing ADC's policies regarding transgender prisoners, and the 30(b)(6) deposition testimony of Gerald Thompson, who testified that sometimes discipline for staff who are arrested "would go all the way up the chain of command" and that Ryan "was usually reviewing something like this," referring to the 2013 arrest of Ramirez, but Thompson did not know whether Ryan actually reviewed it. (Doc 153-1 at 192-193 (McWilliams Dep. at 81:25-82:11); Doc. 153-1 at 300-301; Doc. 153-1 at 134-135 (Thompson Dep. at 108:20-109:1).) There is no evidence, though, that Ryan actually saw the report of Ramirez's 2013 arrest and even if he had, that he was subjectively aware of a substantial risk of harm to Plaintiff because of that arrest. Nor is there any evidence that Ryan was aware of any of the complaints Plaintiff made about sexual assaults. Based on this record, no reasonable jury would conclude that Ryan was subjectively aware of a serious risk of harm to Plaintiff and the Court will grant summary judgment to Ryan on Plaintiff's individual-capacity claim in Count Two.[7]

### 3.    Claims Against State of Arizona

Plaintiff asserts claims of assault and battery, negligence, and negligence per se against the State of Arizona and Ramirez in Counts Three through Five. In each of those Counts, Plaintiff alleges that the State of Arizona "is vicariously liable for the damages caused by [Ramirez's] tortious conduct." (Doc. 129 at 19-21.)

Defendants argue that the State is shielded from liability by Arizona Revised Statutes § 12-820.05(B), which provides, in relevant part, that "A public entity is not liable for losses that arise out of and are directly attributable to an act or omission determined by a court to be a criminal felony by a public employee unless the public entity knew of the public employee's propensity for that action." (Doc. 141 at 19.) Defendants contend that

---

[7] Because the Court has found no genuine issue of material fact regarding whether the Prison Official Defendants violated Plaintiff's constitutional rights the Court need not address the second prong of the qualified immunity analysis on whether the right was clearly established.

all of Plaintiff's state law claims against the State of Arizona arise out of and are derivative of her claims against Ramirez, but that Ramirez's 2013 "non-violent, non-coercive, off-duty, misdemeanor arrest that did not result in charges or a conviction did not impute knowledge to the ADC that Ramirez had the propensity to commit felony sexual misconduct while on duty against an inmate." (*Id.*)

Plaintiff responds that to show "propensity" under the statute, a plaintiff need only show "enough facts to establish that the work environment . . . allowed the State to anticipate an eventual assault." (Doc. 152 at 19, quoting *McGrath v. Scott*, 250 F. Supp. 2d 1218, 1235 (D. Ariz. 2003).) Plaintiff argues that the "State knew of Ramirez's propensity to engage in sexual misconduct and lie about it: he had done so before. Yet, the State allowed Ramirez to continue guarding vulnerable inmates." (*Id.*)

In *McGrath*, the plaintiff alleged that a Department of Public Safety officer subjected her to an unprovoked assault during a routine traffic stop and that the State of Arizona was liable for assault and battery and negligent hiring, training, retention, and supervision. 250 F. Supp. 2d at 1219. The State moved to dismiss, arguing that that it was immune under Arizona Revised Statutes § 12-820.05(B). *Id.* at 1233. The district court found that the complaint sufficiently alleged facts to survive the State's motion to dismiss because the plaintiff alleged that there was a prior complaint of excessive force against the officer and there were "numerous other incidents" that resulted in counseling and reprimand. 250 F. Supp. 2d at 1235 ("While Plaintiff need not allege prior felonies by Scott to establish a propensity, he must allege enough facts to establish that the work environment Scott created allowed the State to anticipate an eventual assault").

In their Reply, Defendants cite to a subsequent case in which an Arizona district court found that "[t]he farthest the cases have ever gone is to suggest that a public entity 'knew' of an employee's propensity to commit a criminal act when it had actual knowledge that its employee committed an act or acts in the past that were similar to the harm suffered by the plaintiff." *Doe v. Dickenson*, 615 F. Supp. 2d 1002, 1016 (D. Ariz. 2009) (finding that "no reasonable jury could conclude that the City 'knew' that Dickenson had a

propensity to molest children" based on the fact that Dickenson spent many hours helping at the school and helping the kids, drove some students to and from school, and occasionally paid for students' field trip costs).

In the more recent case of *Gallagher v. Tucson Unified School District*, the Arizona Court of Appeals found that "constructive knowledge of the employee's propensity" to commit an act was insufficient and that the public entity had to actually know of the employee's propensity for that action. 349 P.3d 228, 232 (Ariz. Ct. App. 2015) (holding that the Arizona legislature's use of the word "knew" in the statute unambiguously showed its intent to require actual knowledge and that summary judgment on behalf of school district was proper where evidence did not support that district had actual knowledge employee was terminated by previous employer for inappropriately touching a patient).

In this case, Ramirez was arrested in 2013, during the time he was employed by ADC, for a crime related to sex—soliciting a prostitute—and he lied during ADC's investigation of that arrest. ADC reprimanded Ramirez for his actions leading to that arrest, for lying during ADC's investigation, and for violating the standards of conduct for State employees. While these facts may suggest that ADC had knowledge of Ramirez's propensity to solicit a prostitute outside of work and to lie about it, there is nothing to suggest that ADC had knowledge that Ramirez would coerce a prisoner to engage in sex acts or that Plaintiff was in danger from Ramirez. This is especially true given that Plaintiff told the investigator investigating her earlier PREA complaint about conditions in the Bachman Unit that she felt safe once she was returned to the Buckley Unit, where Ramirez was stationed, and she did not mention Ramirez or sexual contact with any ADC employee. (Doc. 139 ¶¶ 102-104.) Based on this record, no reasonable jury would conclude that the State of Arizona had actual knowledge of Ramirez's propensity to engage in coercive sex acts with a prisoner and thus the State of Arizona is statutorily immune from liability.

Based on the foregoing, the Court will grant the Prison Official Defendants and the State of Arizona's Motion for Summary Judgment.

. . . .

**IV.    Defendant Ramirez's Motion for Partial Summary Judgment**

    **A.    Relevant Facts**

All ADC corrections officers are required to comply with ADC's Department Orders. (Doc. 150 (Pl.'s Statement of Facts) ¶ 11.) DO 125 on "Sexual Offense Reporting" states that "Staff sexual harassment and any sexual contact or conduct between staff and inmates or offenders is strictly prohibited" and that "[t]here is no consensual sexual contact between staff and inmates or offenders." (*Id.*; Doc.150-1 at 119 (DO 125.01 § 1.2).) DO 708 governs searches and states that "[s]earches shall not be executed for the purpose of punishment or harassment." (Doc. 150 ¶ 12.)

In early 2015, Ramirez (hereinafter "Defendant") "started harassing and grooming" Plaintiff, first by flirting with Plaintiff, then walking by her cell and indicating that he wanted to see Plaintiff's breasts and other body parts, masturbating in front of Plaintiff, "touching" and "pulling" his genitals when she walked by him, and escalating "to assaultive and sham pat down searches," in which he would grope Plaintiff's body and press his genitals against her. (*Id.* ¶¶ 13-17.) Plaintiff was subject to Defendant's sexual abuse for a year and half, "culminating in rape." (*Id.* ¶ 13.)

While Defendant was employed by ADC, he was required to perform pat-down searches of prisoners, which involved patting down a prisoner's chest, stomach, and top of the groin area, as well as the upper part of the prisoner's leg "well into the groin and buttocks area." (Doc. 143 (Defendant's Statement of Facts) ¶¶ 8-9.) ADC policies do not have any special provisions for pat-down searches of male-to-female transgender prisoners incarcerated in an all-male facility and COs were required to search transgender prisoners in the same manner as male prisoners. (*Id.* ¶ 10.) Transgender prisoners "sometimes attempt to smuggle contraband in their brassieres, and a thorough pat-down search includes a search of the chest area, including the breast area for transgender inmates who had undergone breast augmentation procedures." (*Id.* ¶ 11.)

Plaintiff denies that Defendant has established that ADC policy required "thorough" searches of transgender prisoners' chest area or that "such searches would be relevant to

this case where Plaintiff alleges assaultive and sham pat down searches." (Doc. 151 ¶ 11.) Plaintiff wears a brassiere and has placed and seen other transgender prisoners place items in their brassieres. (Doc. 143 ¶¶ 12-13.) Plaintiff does not deny these facts but denies they are relevant to this case. (Doc. 151 ¶¶ 12-13.)

A number of the pat-down searches that Plaintiff asserts are actionable as rape were done in front of other COs. (Doc. 143 ¶ 14.) Defendant denies ever grabbing or groping Plaintiff's breasts during a pat-down search for any sexual reason, pressing his body against Plaintiff for his sexual pleasure or gratification, and only made contact with Plaintiff during pat-down searches as required by his duties as a CO. (*Id.* ¶¶ 15-17.) Plaintiff disputes these facts, asserting that Defendant conducted "assaultive and sham" pat-down searches on her during which Defendant would grope her body and press his genitals against her. (Doc. 151 ¶¶ 15-17.) Plaintiff further asserts that throughout 2015 and 2016 "[Defendant] conducted more than fifteen assaultive pat down searches on [Plaintiff], groping her body and 'moan[ing]' and grunt[ing]' in a sexual manner. (*Id.* ¶ 17.)

The first sexual encounter between Plaintiff and Defendant occurred in January or February 2015 and the last sexual encounter was in May 2016. (Doc. 143 ¶¶ 24-25.) Defendant contends that there was no sexual contact between them other than two instances of oral sex, which Plaintiff disputes. (*Id.* ¶ 26; Doc. 151 ¶ 26.) Plaintiff asserts that Defendant forced her to perform oral sex on him 8-12 times in all and that 4-6 of those times occurred between January or February and September 2015 and 2-5 of those encounters occurred between February and May 2016. (Doc. 151 ¶ 26.) Plaintiff had no contact with Defendant from approximately September 2015 to February 2016, when she was housed in a different unit. (Doc. 143 ¶ 29; Doc. 151 ¶ 29.)

During the CIU investigation of Plaintiff's PREA report, Plaintiff told Officer Currier that she and Defendant began a "flirtatious" relationship with "mutual" flirting in January 2015, that she was "flattered" by Defendant's attention, and that "she was no innocent lily," but Plaintiff denies that this means she "consented to [Defendant's] escalating sexual abuse." (Doc. 143 ¶¶ 33, 35; Doc. 151 ¶¶ 33, 35.) Plaintiff states, "there

was nothing mutual about [the abuse]" and that she felt she could not say "no" because Defendant "had the power to punish her if she did not do as he demanded." (Doc. 151 ¶¶ 33, 35.) Plaintiff told Currier that the final sexual encounter between herself and Defendant occurred no later than May 31, 2016. (Doc. 143 ¶ 34; Doc. 151 ¶ 34.) While Plaintiff admits that Defendant never explicitly "promised" her anything in exchange for oral sex, she disputes that Defendant never coerced, threatened or forced her to perform oral. (Doc. 143 ¶ 37; Doc. 151 ¶ 37.) Plaintiff again states there was nothing mutual about the abuse, that she felt she could not say no to Defendant, and that Defendant "regularly 'grilled' her on whether she had told anyone about his conduct, which she took as an 'implicit threat to stay quiet.'" (Doc. 151 ¶ 37.)

Plaintiff served her notice of claim on Defendant on August 26, 2016 and filed her initial Complaint on May 26, 2017. (Doc. 143 ¶¶ 41, 43; Doc. 151 ¶¶ 41, 43.)

### B.   Discussion

Defendant argues that discrete instances of conduct that Plaintiff claims violated her constitutional rights are barred by the statute of limitations, that any state law claims that accrued prior to May 26, 2015 are time barred or barred because Plaintiff did not timely serve a notice of claim on Defendant, and that he is entitled to absolute and qualified immunity.

### 1.   Federal Claims

#### a)   Statute of Limitations

Defendant argues that any conduct underlying Plaintiff's § 1983 claim that occurred before May 26, 2015 is time barred. (Doc. 142 at 8.) Defendant argues Plaintiff did not file her Complaint until May 26, 2017 and, when applying Arizona's two-year statute of limitations for personal injury claims, any conduct occurring prior to May 26, 2015 is time barred. To the extent Plaintiff argues that her claims are subject to the continuing violations doctrine, Defendant argues that the Ninth Circuit "has expressly held that the doctrine is no longer viable." (*Id*. at 9, citing *Bird v. Dep't of Human Servs*., 935 F.3d 738, 746 (9th Cir. 2019).) Plaintiff responds the continuing violations doctrine does apply to Defendant's

1   conduct of "grooming" her and engaging in an escalating pattern of sexual abuse.
2   (Doc. 149 at 13.)

3        Defendant previously sought to dismiss Plaintiff's § 1983 claims for discrete acts
4   that occurred prior to May 26, 2015, and the Court denied the motion, finding that
5   Plaintiff's constitutional claims were more like the Title VII hostile workplace claims that
6   the Supreme Court found were based on cumulative conduct rather than on discrete
7   violations that were independently actionable. (Doc. 91 at 8, citing *Nat'l R.R. Passenger*
8   *Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002).)

9        Defendant now cites to *Bird*, which issued after the Court denied Defendant's
10  Motion to Dismiss. In *Bird*, the Ninth Circuit did observe that after *Morgan*, "little remains
11  of the continuing violations doctrine. Except for a limited exception for hostile work
12  environment claims—not at issue here—the serial acts branch [of the continuing violations
13  doctrine] is virtually non-existent." *Bird*, 935 F.3d at 748 (holding that the plaintiff's claim
14  that she was placed on the State of Hawaii's child protective services central registry was
15  a single, discrete act and that the continuing violation doctrine did not apply despite her
16  claim that she suffered a continuing harm from that discrete act).

17       Unlike the plaintiff in *Bird*, Plaintiff here is not claiming that she has suffered
18  continuing harm from one single, discrete act. Rather, her claims are based "on the
19  cumulative effect of individual acts" that the Supreme Court permitted in *Morgan* in the
20  Title VII hostile workplace context. Thus, for the same reasons the Court denied
21  Defendant's Motion to Dismiss, the Court will deny Defendant's Motion for Partial
22  Summary Judgment on this basis.

23           **b)**    **Qualified Immunity**

24       Defendant argues that he is entitled to qualified immunity for the pat-down searches,
25  asserting that he was acting as a corrections officer when he performed the pat-down
26  searches of Plaintiff. (Doc. 142 at 15.) Defendant argues that transgender prisoners can,
27  and do, put items in their brassieres and that he was required to perform pat-down searches
28  of all prisoners which required searching their chest, legs, buttocks, and in the case of

transgender female prisoners, their breasts. (*Id.* at 15-16.) Defendant contends there is no evidence that he performed pat-down searches for his own sexual gratification or that he pressed himself against Plaintiff. (*Id.* at 16.)

Defendant previously sought to dismiss Plaintiff's federal claim on the basis of qualified immunity, and the Court denied the motion on that basis, finding that Plaintiff's allegations plausibly supported the conclusion that Defendant engaged in forcible sexual assault of Plaintiff during the searches and that Ninth Circuit law was clear that a guard's sexual assault of a prisoner was unlawful. (Doc. 91 at 10-11.)

Plaintiff has now substantiated her allegations with evidence that the pat-down searches were more than routine. In her Declaration, Plaintiff states that Defendant's behavior escalated from him grabbing his genitals when he saw her and masturbating in front of her to "grabbing [her] breasts and other body parts during so-called 'pat down' searches" and "grunting and moaning" while he groped her. (Doc. 150-1 at 54.) A reasonable jury could conclude that this behavior was more than a routine pat-down search and constituted non-consensual sexual contact or assault, in violation of Plaintiff's constitutional rights. As the Court previously noted, the Ninth Circuit has made it clear that "[w]here guards themselves are responsible for the rape and sexual abuse of inmates, qualified immunity offers *no* shield." *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000).

Accordingly, Defendant is not entitled to qualified immunity on Plaintiff's federal claims related to the pat-down searches.

### 2. State Law Claims

#### a) Immunity Under A.R.S. § 31-201.01(F)

Defendant previously moved to dismiss the state law claims based on the immunity provided by Arizona Revised Statutes § 31-201.01(F) for actions taken by ADC officers and employees "within the scope of their legal duty." The Court denied Defendant's Motion to Dismiss on this basis, finding that Defendant's alleged conduct fell well outside the scope of his employment and that the statutory immunity did not bar Plaintiff's state

law claims against Defendant. (Doc. 91.) Defendant appealed this decision, and the Ninth Circuit Court of Appeals affirmed, finding that the acts alleged were "outside the scope of [Defendant's] legal duty" as a corrections officer. (Doc. 148-1 at 3.)

In her Response to Defendant's Motion for Summary Judgment, Plaintiff argues that under the law of the case doctrine, Defendant is precluded from asserting absolute immunity under § 31-201.01(F). (Doc. 149 at 16-17.) Alternatively, Plaintiff argues that Defendant is not entitled to statutory immunity because "forcing oral sex on an inmate was plainly not part of [Defendant's] statutory legal duty to maintain prisoners in custody." (*Id.* at 19.) Defendant argues in his Reply that the law of the case doctrine is inapplicable here because denial of a motion to dismiss does not constitute law of the case for purposes of summary judgment. (Doc. 157 at 7.)

Defendant is correct that "[t]he denial of motions to dismiss do not constitute law of the case for the purpose of summary judgment." *Peck v. Hinchey*, No. CV 12-01371-PHX-JAT, 2017 WL 2929464, at *5 n.5 (D. Ariz. July 7, 2017) (quoting *Moonin v. Nevada*, No. 3:12-CV-000353-LRH, 2015 WL 4113289, at *6 (D. Nev. July 8, 2016) and citing *Robbins v. Wilkie*, 433 F.3d 755, 764 (10th Cir. 2006) ("Law of the case does not apply because a motion to dismiss and a motion for summary judgment do not raise the same issues"). Thus, the Court must determine, based on the developed record and viewing the evidence in favor of the non-moving party, if there is a genuine issue of material fact regarding Plaintiff's state law claims and, if so, whether Defendant is entitled to absolute immunity under Arizona Revised Statutes § 31-201.01(F).

Defendant has admitted to oral sex with Plaintiff on two occasions and Plaintiff asserts that there were 8-10 instances of Defendant forcing her to perform oral sex. ADC Department Orders strictly prohibit any sexual contact between staff and prisoners. Thus, there is no dispute that on at least two occasions, Defendant had sexual contact with Plaintiff in violation of Department Orders. Those minimum of two occasions were clearly not within the scope of Defendant's legal duty, and Defendant is not entitled to the

1   protection of the statutory immunity under § 31-201.01(F). Thus, the Court will deny

2   summary judgment to Defendant on this basis.

3                          **b)      Statute of Limitations**

4           As in his prior Motion to Dismiss, Defendant argues that Plaintiff's state law claims

5   for events prior to May 26, 2016 are barred by Arizona's one-year statute of limitations for

6   actions against a public employee as addressed in Arizona Revised Statutes § 12-821.[8]

7   (Doc. 142 at 11-13.) The Court denied the motion, finding that § 12-821 "can only be

8   reasonably interpreted to solely encompass" claims against a public employee who was

9   acting within that public employee's scope of employment. (Doc. 91 at 5, quoting *McCloud*

10  *v. Ariz. Dep't of Public Safety*, 170 P.3d 691, 699-700 (Ariz. Ct. App. 2007) ("to interpret

11  § 12-821 to apply to claims against a public employee who was not acting in the scope of

12  his or her employment at the time of the actionable event would be contrary to the

13  legislature's intent and inconsistent with the interpretation of related statutes").)

14          Here, Defendant has admitted to engaging in oral sex with Plaintiff on two

15  occasions. No reasonable jury would conclude that those actions were within the scope of

16  Defendant's employment. Because the requirements of § 12-821 do not apply to actions

17  taken by public employees outside the scope of their employment, Defendant's Motion for

18  Summary Judgment based on § 12-821 will be denied.

19                          **c)      Notice of Claim**

20          Defendant argues that because Plaintiff did not serve her notice of claim on him

21  until August 26, 2016, Plaintiff cannot proceed with any state law claims predicated on

22  conduct occurring prior to February 28, 2016 under Arizona's notice of claim statute,

23  which requires a claim to be filed within 180 days after the cause of action accrues.

24  (Doc. 142 at 13.) *See* Ariz. Rev. Stat. § 12-821.01(A). "An assertion that a plaintiff did not

25  comply with the notice of claim statute is an affirmative defense subject to waiver[,]" and

26  "[a] defendant that has raised the defense in its answer may waive the defense by

27  _____

28          [8] "All actions against any public entity or public employee shall be brought within
    one year after the cause of action accrues and not afterward." Ariz. Rev. Stat. § 12-821.

subsequent conduct." *Ponce v. Parker Fire Dist.*, 322 P.3d 197, 200 (Ariz. Ct. App. 2014) (citing *City of Phoenix v. Fields*, 201 P.3d 529, 535 (2009)). The defense is waived when the defendant actively litigates the merits of the case. *Id.*; *see Jones v. Cochise Cnty.*, 187 P.3d 97, 104–05 (Ariz. Ct. App .2009) (finding waiver when the government entity substantially participates in litigation). A defendant who asserts a notice of claim defense "must seek prompt resolution of it." *Ponce*, 322 P.2d at 200.

In his Answer to Plaintiff's Third Amended Complaint, Defendant affirmatively asserted the one and two-year statute of limitations defenses, but did not affirmatively assert that any of Plaintiff's claims were barred by Arizona's notice of claim statute. (Docs. 79, 131.) Nor did Defendant raise the notice of claim defense in his prior Motions to Dismiss. (*See* Doc. 30 (denied as moot), Doc. 61 (denied as moot), Doc. 78 (denied).) Instead, Defendant proceeded to appeal the denial of his third Motion to Dismiss and to actively litigate the case on the merits by answering the Third Amended Complaint (without asserting the notice of claim defense), participating in discovery (Doc. 124), and moving to extend the dispositive motion deadline (Doc. 134). Only when he filed his Motion for Summary Judgment did Defendant raise for the first time the notice of claim defense. (Doc. 142.) The Court concludes, as a matter of law, that Defendant waived his notice of claim defense by failing to seek prompt judicial resolution of that defense.

Based on the foregoing, the Court will deny Defendant Ramirez's Motion for Partial Summary Judgment.

**IT IS ORDERED:**

(1)     The reference to the Magistrate Judge is withdrawn as to Defendants Ryan, McWilliams, Moody, and the State of Arizona's Motion for Summary Judgment (Doc. 141) and Defendant Juan Ramirez's Motion for Partial Summary Judgment (Doc. 142).

(2)     Defendants Ryan, McWilliams, Moody, and the State of Arizona's Motion for Summary Judgment (Doc. 141) is **granted** and Defendants Ryan, McWilliams, Moody and the State of Arizona are dismissed from this action.

(3)     Defendant Juan Ramirez's Motion for Partial Summary Judgment (Doc. 142) is **denied**.

(4)     The remaining claims are Counts One, Three, Four and Five against Defendant Ramirez.

(5)     This action is referred to Magistrate Judge Camille D. Bibles to conduct a settlement conference on Plaintiff's remaining claims against Defendant Ramirez.

(6)     Counsel for Plaintiff and Defendant Ramirez must jointly call Magistrate Judge Bible's chambers at (928) 774-2586 within **14 days** to schedule a date for the settlement conference.

Dated this 10th day of August, 2020.

Honorable John J. Tuchi
United States District Judge